UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X    **FOR PUBLICATION**

In re:                                                          :
                                                                :
BERNARD L. MADOFF INVESTMENT                                    :    Case No. 08-99000 (SMB)
SECURITIES LLC,                                                 :    Adv. Pro. No. 08-01789 (SMB)
                                                                :    SIPA LIQUIDATION
                                    Debtor.                     :
---------------------------------------------------------------X

IRVING H. PICARD, Trustee for the                              :
Liquidation of Bernard L. Madoff                               :
Investment Securities LLC,                                     :
                                                                :
                                    Plaintiff,                  :
                                                                :
              – against –                                      :    Adv. Pro. No. 10-04336 (SMB)
                                                                :
THE ESTATE (SUCCESSION) OF DORIS                               :
IGOIN, LAURENCE APFELBAUM,                                     :
individually and in her capacities as executor                 :
and beneficiary of the Estate (Succession) of                  :
Doris Igoin, and EMILIE APFELBAUM,                             :
                                                                :
                                    Defendants.                 :
---------------------------------------------------------------X

**MEMORANDUM DECISION REGARDING DEFENDANTS'
MOTION TO DISMISS FOR LACK OF PERSONAL
JURISDICTION AND *FORUM NON CONVENIENS***

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
*Attorneys for Plaintiff, Irving H. Picard,*
  *Trustee for the Liquidation of*
  *Bernard L. Madoff Investment Securities LLC*
45 Rockefeller Plaza
New York, NY 10111

        David J. Sheehan, Esq.
        Tracy Cole, Esq.
        Ona T. Wang, Esq.
              Of Counsel

KELLEY DRYE & WARREN LLP
*Attorneys for Defendants the Estate (Succession)*
  *of Doris Igoin, Laurence Apfelbaum, and*
  *Emilie Apfelbaum*
101 Park Avenue
New York, NY 10178

> Jonathan K. Cooperman, Esq.
> Jessica L. Klarfeld, Esq.
>   Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Irving H. Picard ("Trustee"), as trustee for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA") and the estate of Bernard L. Madoff,

commenced this adversary proceeding to avoid and recover fraudulent transfers aggregating in

excess of $150 million. The Defendants, French residents, have moved to dismiss the complaint

for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil

Procedure and for *forum non conveniens.* After the motion was heard, the Court permitted

jurisdictional discovery, and the parties thereafter submitted supplemental papers.

The Court concludes that the Trustee has made a *prima facie* showing of personal

jurisdiction. However, the jurisdictional facts remain in dispute and are intertwined with the

merits. Hence, the Court will try the issue of personal jurisdiction together with the trial on the

merits. The branch of the Defendants' motion to dismiss based on *forum non conveniens* is

denied.

# BACKGROUND

## A.    The Accounts

The facts surrounding Bernard Madoff's Ponzi scheme have been described in numerous reported decisions. *E.g.*, *Picard v. JPMorgan Chase & Co. (In re BLMIS)*, 721 F.3d 54, 58–59 (2d Cir. 2013), *cert. denied*, 134 S.Ct. 2895 (2014); *Sec. Investor Prot. Corp. v. BLMIS (In re BLMIS)*, 424 B.R. 122, 125–32 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011), *cert. denied,* 133 S.Ct. 24 (2012). The Court assumes familiarity with those facts and limits its discussion to the facts relevant to this proceeding.[1] The Defendants Laurence Apfelbaum ("Laurence") and her daughter Emilie Apfelbaum ("Emilie") reside in Paris, France. Laurence is a sixty-five year old practicing psychoanalyst, (*Defendants Facts*, ¶ I.A), and Emilie, thirty years old, works in an art gallery and lives with her mother. (*Apfelbaum Deposition*, 23:2-19; *Apfelbaum Declaration*, ¶ 4.) Doris Igoin ("Doris"), Laurence's mother, passed away in 2005, (*Apfelbaum Declaration*, ¶ 1), and the Estate (Succession) of Doris Iogin ("Doris's Estate") is the third defendant. The term "Defendants" used in this opinion includes Doris during her lifetime and Doris's Estate after her death.

The accounts that are subject of this action originated with Laurence's father, Albert Igoin, who passed away in 1995. (*Trustee Facts*, ¶ 2; *Defendants Facts*, ¶ II.D.) Following his death, Laurence learned that her father's primary investment was an account at a French Bank— Banque Pour l'Industrie Francaise ("BIF")—which, in turn, was invested with BLMIS.

---

[1]    The relevant facts are culled from the (i) *Declaration of Laurence Apfelbaum*, dated Apr. 2, 2012 ("*Apfelbaum Declaration*") (ECF Doc. # 21); (ii) *Deposition of Laurence Apfelbaum*, dated Mar. 26-27, 2014 ("*Apfelbaum Deposition*") (ECF Doc. #93-2 and 93-3); (iii) *Trustee's Statement of Material Jurisdictional Facts*, dated Aug. 20, 2014 ("*Trustee Facts*") (ECF Doc. # 108); and (iv) *Response to the Trustee's Statement of Material Facts*, dated Sept. 5, 2014 ("*Defendants Facts*") (ECF Doc. #113). "ECF Doc. # __" refers to documents filed on the docket of this adversary proceeding.

(*Apfelbaum Declaration*, ¶¶ 8, 11.)  BIF later became Finama bank.  (*Apfelbaum Deposition*,

77:16.)

Albert's will provided that his wife Doris inherit 50% of his assets, and the other 50%

pass to his daughter and granddaughter, Laurence and Emilie, respectively.  (*Trustee Facts*, ¶ 32;

*Defendants Facts*, ¶ VII.C.)[2]  After Albert's death, Madoff met with Laurence in Paris, and

following that meeting, Laurence decided to keep the assets that she and Emilie had inherited

invested with BLMIS.  (*Apfelbaum Declaration*, ¶ 8.)  On June 12, 1995, Laurence signed a

customer agreement with BLMIS (the "*Laurence Customer Agreement*").[3]  The *Laurence

Customer Agreement*, which was written in French, provided, among other things, as follows:

> This agreement is between Bernard L. Madoff Investment securities ("Madoff"),
> the offices of which are at 825 Third Avenue, New York, NY 10022 USA, and
> Laurence Apfelbaum, "client"), residing at [street address] Paris.
>
> Given that *the client wishes to make certain securities investments through
> Madoff*, and that Madoff wishes to make these, and given that the client had
> requested specific insurances and conditions and that Madoff had accepted these,
> the two parties agree as follows:
>
> 1) The client agrees to *deposit funds and/or securities with Madoff, so that these
>    can be deposited into an account at Madoff for the client's benefit.*
>
> 2) *Madoff agrees to set up this account for the client's benefit and to invest these
>    funds in securities listed on the United States stock market and to invest the
>    returns therefrom on the client's behalf.*
>
>    . . .
>
> 4) The client will pay Madoff, in commission, fees not exceeding 12.5 US cents
>    per share and 300 US dollars for every 1,000,000 dollars in American
>    Government bonds.  These commissions are less than the customary and

---

[2]    Although Laurence and Emilie inherited 50% under Albert's will, Doris retained the equivalent of a life
estate over their half.  (*Trustee Facts*, ¶ 32; *Defendants Facts*, ¶ VII.C.)  Doris later agreed to give up her life estate
allowing Laurence and Emilie to inherit directly from Albert.  (*Trustee Facts*, ¶ 34; *Defendants Facts*, ¶¶ VII.F, G.)

[3]    A copy of the *Laurence Customer Agreement* translated into English is attached as Exhibit A to the
*Declaration of Ona T. Wang in Support of the Trustee's Memorandum of Law in Opposition to Defendants' Motion
to Dismiss*, dated Aug. 3, 2012 ("*Wang Declaration*") (ECF Doc. # 31).

> generally accepted commissions charged by the "US registered Broker-
> Dealers" and members of the "National Association of Securities [Dealers]."
> . . . .

(*Laurence Customer Agreement* at 1 (emphasis added).)

Because Emilie was only eleven years old at the time of her grandfather's death, a French guardianship judge—Judge Standish—oversaw her inheritance. (*Apfelbaum Deposition*, 173:15-22.) Judge Standish would not permit all of Emilie's assets to be invested with BLMIS. (*Trustee Facts*, ¶ 35; *Defendants Facts*, ¶ VII.J.) Instead, he required that half of Emilie's inheritance be invested in French treasury bonds, (*Trustee Facts*, ¶ 35; *Defendants Facts*, ¶ VII.J), while the remaining half could be invested in BLMIS only if Madoff personally guaranteed that losses would not exceed 5% per year. (*Trustee Facts*, ¶ 36; *Defendants Facts*, ¶ VII.K.) Madoff agreed to provide the required guarantee and on June 12, 1995, entered in a customer agreement with Emilie, also written in French ("*Emilie Customer Agreement*,"[4] and together with the *Laurence Customer Agreement*, the "*Customer Agreements*").[5] Laurence signed the *Emilie Customer Agreement* on behalf of her minor daughter. (*Apfelbaum Declaration*, ¶ 9.) After Emilie attained majority, the money that was previously invested in French treasury bonds was invested with BLMIS. (*Apfelbaum Deposition*, 236:2-238:25.)

Until late 1999, the Defendants' BLMIS accounts were held and administered by BIF and later Finama through Finama's foreign services bureau in Paris. (*Apfelbaum Declaration*, ¶ 11.) In late 1999, Finama informed the Defendants that it was closing its foreign services bureau, and

---

[4]     A copy of the *Emilie Customer Agreement* translated into English is attached as Exhibit A to the *Wang Declaration*.

[5]     The *Emilie Customer Agreement* was substantially similar to the *Laurence Customer Agreement* but also included language memorializing Madoff's guarantee.

the Defendants would have to maintain their accounts directly with BLMIS.  (*Id.*, ¶ 12.)

Thereafter, Laurence managed her and Emilie's BLMIS accounts, and Doris continued to handle

her own BLMIS account.  (*Id.*, ¶ 13.)

According to Exhibit B attached to the *Amended Complaint*, dated Apr. 23, 2012 (ECF

Doc. # 27), Laurence's and Emilie's accounts were opened on May 1, 1995, and each was

funded with a $33,150,157 transfer, presumably from Albert's account.[6]  Between then and

December 11, 2008 (the "Filing Date"), over 145 withdrawals totaling $147,261,229 were made

from Laurence's account, including fifty withdrawals totaling $79,404,202 within six years of

the Filing Date and nineteen totaling $16,962,339 within two years of the Filing Date.  Exhibit B

also shows that there were over 130 withdrawals totaling $34,668,026 during the life of Emilie's

BLMIS account, including fifty-one withdrawals totaling $15,456,814 and sixteen totaling

$8,142,060, respectively, within six years and two years of the Filing Date.  No monies were

withdrawn from Doris' Estate's account within two years of the Filing Date, and for the reasons

discussed below, no claims lie against it.

Although the Defendants admit that they withdrew money from their BLMIS accounts,

they concede little else of what the Trustee has alleged.  They challenge the authenticity and

admissibility of Exhibit B and claim they were denied discovery of the underlying data.

Laurence generally contends that her contacts with BLMIS were few and far between although

she does admit that she communicated with the BLMIS office whenever she wanted to make a

---

[6]    The Trustee maintains that the initial deposits consisted entirely of fictitious profits.

withdrawal.[7] (*Apfelbaum Declaration*, ¶ 15.)  She also argues that the majority of the money that she withdrew and all of the money that Emilie withdrew was used to pay French taxes based on the assumption that the monies in the accounts were real.  (*Id.*, ¶¶ 17, 19.)

## B.    The SIPA Liquidation

The Securities Investor Protection Corporation filed this liquidation proceeding on the Filing Date.  After the District Court appointed the Trustee and referred the liquidation to this Court, Judge Lifland entered an order establishing procedures for filing and determining customer claims.  The order required customers to file their claims with the Trustee and directed the Trustee to determine all claims in writing.  If the claimant did not object to the Trustee's determination within thirty days, the determination was deemed to have been approved by the Court and binding on the claimant.

Laurence and Emilie filed customer claims in the amounts of $335,075,000 and $123,175,000, respectively. (*Trustee Facts*, ¶¶ 80, 81; *Defendants Facts*, ¶¶ XI.H, I.)  The Trustee denied the claims in writing, and the Defendants never filed an objection.  (*Trustee Facts*, ¶ 82; *Defendants Facts*, ¶ XI.K.)  Accordingly, their customer claims have been finally disallowed regardless of the outcome of this adversary proceeding.

## C.    The *Motion*

The Trustee sued to recover the BLMIS transfers made to the Defendants within two years of the Filing Date and six years of the Filing Date as fraudulent transfers under bankruptcy

---

[7]       Laurence also communicated directly with Madoff to tell him that Doris had passed away and Laurence was trying to sort out her estate. (*Apfelbaum Deposition*, 207:20-208:1.)  In addition, she communicated with BLMIS employee Frank DiPascali on several occasions to redeem treasury bills for tax purposes.  (*Id.*, 90:20-93:20; 153:25-154:11.)

and New York law. Doris's Estate did not receive any transfers within two years of the Filing

Date. In light of the decision of the Second Circuit Court of Appeals upholding the applicability

of the safe harbor defense contained in 11 U.S.C § 546(e), *Picard v. Ida Fishman Revocable*

*Trust (In re BLMIS)*, 773 F.3d 411, 423 (2d Cir. 2014), the Trustee is limited to avoiding

intentional fraudulent transfer claims made within two years of the Filing Date. Hence, no

claims lie against Doris's Estate (absent reversal by the Supreme Court).

The Defendants filed their motion to dismiss on April 2, 2012. (*See Motion to Dismiss*

*Complaint*, dated Apr. 2, 2012 (the "*Motion*") (ECF Doc. # 19).)[8] Initially, Defendants argued

that this Court lacked personal jurisdiction because (i) the filing of a customer claim in a SIPA

liquidation did not result in such customer's consent to bankruptcy court jurisdiction, and (ii) the

Defendants' limited connections to New York were insufficient to subject them to the general or

specific jurisdiction of the Court. (*Defendants Memo*, 6-19.) In the alternative, the Defendants

sought dismissal based on the doctrine of *forum non conveniens*. (*Id.*, 19-28.)[9] The Trustee

countered that personal jurisdiction existed over the Defendants because (i) they filed SIPA

customer claims, (ii) they opened BLMIS accounts to invest in the United States, actively

managed their BLMIS accounts and received transfers from their BLMIS accounts, (iii) they

contacted BLMIS to arrange for large withdrawals, and (iv) they participated in this adversary

---

[8]    The *Motion* is supported by (i) *Declaration of Jonathan K. Cooperman*, dated Apr. 2, 2012 (ECF Doc. #
20), (ii) *Apfelbaum Declaration*, (iii) *Declaration of Bruno Quint*, dated Apr. 2, 2012 ("*Quint Declaration*") (ECF
Doc. # 22), and (iv) *Memorandum of Law in Support of the Motion*, dated Apr. 2, 2012 ("*Defendants Memo*") (ECF
Doc. # 23). Although the *Motion* sought to dismiss the original complaint, the parties later stipulated to treat the
*Motion* as a motion to dismiss the *Amended Complaint*. (*See Stipulation and Order Setting Briefing Schedule*, dated
June 18, 2012 ("*2012 Stipulation*") (ECF Doc. # 29).)

[9]    The Defendants also argued in the *Motion* that section 546(e) of the Bankruptcy Code prevented the
Trustee from avoiding transfers other than those arising under section 548(a)(1)(A) of the Bankruptcy Code,
(*Defendants Memo*, 28-31), but the parties stipulated to proceed with the *Motion* on the personal jurisdiction and
*forum non conveniens* issues. (*2012 Stipulation*.)

proceeding by negotiating stipulations and filing a motion to withdraw the reference.
(*Memorandum of Law in Opposition to the Motion*, dated Aug. 3, 2012, at 8-18 ("*Trustee Memo*")[10] (ECF Doc. # 30).)  The Trustee also opposed the Defendants' request for dismissal on *forum non conveniens* grounds.  (*Id.*, 19-31.)

At a chambers conference held on October 23, 2012, the Court adjourned the *Motion* "to allow the parties to engage in jurisdictional discovery."  (*See Minutes Order*, dated Oct. 23, 2012 (ECF Doc. # 45).)  Following jurisdictional discovery and pursuant to a May 7, 2014 Court ordered stipulation,[11] the parties provided supplemental briefing and factual materials on the issue of personal jurisdiction.[12]

During the pendency of the *Motion*, the parties submitted a substantial quantity of legal and factual materials.  In the end, it was not clear whether the material jurisdictional facts were disputed.  The Court suggested that an evidentiary hearing would be necessary, but the Defendants were anxious to avoid a trip to New York if at all possible.  As a result, the Court instructed the Trustee to submit a statement of material jurisdictional facts with citations to the record,[13] and instructed the Defendants to admit or deny the Trustee's facts and add

---

[10]    The *Trustee Memo* is supported by the *Wang Declaration*.

[11]    *See Stipulation and Order Setting Briefing Schedule*, dated May 7, 2014 (ECF Doc. # 85).

[12]    *See Trustee's Supplemental Memorandum of Law in Opposition to Defendants' Motion to Dismiss*, dated June 20, 2014 (ECF Doc. # 92); *Supplemental Declaration of Ona T. Wang in Support of Trustee's Opposition to Defendants' Motion to Dismiss*, dated June 20, 2014 (ECF Doc. # 93); *Jurisdictional Memorandum of Law in Further Support of Defendants' Motion to Dismiss*, dated June 23, 2014 (ECF Doc. # 95); *Declaration of Jonathan K. Cooperman in Further Support of Defendants' Motion to Dismiss Based on Jurisdictional Discovery*, dated June 23, 2014 (ECF Doc. # 96); *Trustee's Supplemental Reply in Further Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Forum Non Conveniens*, dated July 18, 2014 ("*Trustee Supplemental Reply*") (ECF Doc. # 100); *Memorandum of Law In Response to the Trustee's Supplemental Memorandum of Law and in Further Support of Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and for Forum Non Conveniens*, dated July 18, 2014 (ECF Doc. #101).

supplemental facts.[14]  (*See Tr*. at 61:12-23.)[15]  The procedure was adopted to determine whether

there was a dispute as to the material jurisdictional facts such that an evidentiary hearing (either

prior to or at trial) was necessary.

## DISCUSSION

### A.    Personal Jurisdiction

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the

Federal Rules of Civil Procedure, the plaintiff bears the burden of showing that the court has

jurisdiction over the defendant.  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566

(2d Cir.) (citing *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994)),

*cert. denied*, 519 U.S. 1006 (1996).  Trial courts have "considerable procedural leeway" in

deciding a pretrial motion to dismiss for lack of personal jurisdiction – "[i]t may determine the

motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may

conduct an evidentiary hearing on the merits of the motion."  *Dorchester Fin. Sec., Inc. v. Banco*

*BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Marine Midland Bank, N.A. v. Miller*, 664

F.2d 899, 904 (2d Cir. 1981)).  Where, as here, a defendant moves to dismiss under Rule

12(b)(2), the court permits jurisdictional discovery and receives discovery materials but does not

hold an evidentiary hearing, "the plaintiff's *prima facie* showing, necessary to defeat a

jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would

suffice to establish jurisdiction over the defendant."  *Ball v. Metallurgie Hoboken-Overpelt S.A.*,

902 F.2d 194, 197 (2d Cir.) (citations omitted), *cert. denied*, 498 U.S. 854 (1990); *accord Metro.*

---

[13]     *See Trustee Facts*.

[14]     *See Defendants Facts*.

[15]     "*Tr.* at __:__" refers to the transcript of the Aug. 6, 2014 hearing, a copy of which is available at ECF Doc.
# 112.

*Life*, 84 F.3d at 567.  If the jurisdictional facts are in dispute, the plaintiff must ultimately

establish personal jurisdiction over the defendant by a preponderance of the evidence at an

evidentiary hearing or at trial.  *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154

(2d Cir. 1999); *Metro. Life*, 84 F.3d at 567.

Due process limits the exercise of personal jurisdiction over a foreign defendant,

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984), and consists of

two components.  First, the defendant must have minimum contacts with the forum.  *Int'l Shoe*

*Co. v. Washington*, 326 U.S. 310, 316 (1945).  To exercise personal jurisdiction over a foreign

defendant in a bankruptcy adversary proceeding, the plaintiff must show that the defendant has

requisite minimum contacts with the United States rather than the forum state.  *Warfield v. KR*

*Entm't, Inc. (In re Fed. Fountain, Inc.)*, 165 F.3d 600, 601-02 (8th Cir. 1999); *Owens-Illinois,*

*Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 630 (4th Cir. 1997); *Enron Corp. v.*

*Arora (In re Enron Corp.)*, 316 B.R. 434, 444-45 (Bankr. S.D.N.Y. 2004).  The minimum

contacts inquiry distinguishes between specific jurisdiction and general jurisdiction.  *Metro. Life*,

84 F.3d at 567.  Specific jurisdiction exists when the exercise of personal jurisdiction arises out

of or is related to the defendant's forum contacts.  *Helicopteros*, 466 U.S. at 414 n. 8.  General

jurisdiction is based on the defendant's continuous and systematic general business contacts with

the forum and permits the court to exercise personal jurisdiction where the subject matter of the

dispute is unrelated to those contacts.  *See id*. at 414 n. 9.  The Defendants lack the continuous

and systemic general business contacts with the United States necessary to establish general

jurisdiction, and the Trustee must, therefore, rely on specific jurisdiction.

Second, due process requires that the exercise of personal jurisdiction comport with

"traditional notions of fair play and substantial justice," *Int'l Shoe*, 326 U.S. at 316; *accord*

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985), that is, that the exercise of personal jurisdiction must be reasonable under the circumstances. *Metro. Life*, 84 F.3d at 568. The factors bearing on the "reasonableness" analysis include (1) the burden that the exercise of personal jurisdiction will place on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several States in furthering substantive social policies. *Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102, 113 (1987); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).

The two components are related and their relative strengths must be weighed against each other. "[I]n assessing whether it may exercise jurisdiction over a particular defendant, a court must weigh the relative strengths and weaknesses of each requirement—that is, depending upon the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry." *Metro. Life*, 84 F.3d at 568; *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994) ("[T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness."). Where a defendant challenging personal jurisdiction has purposely directed activities at forum residents, "he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477; *accord Metro. Life*, 84 F.3d at 568.

12

With this background, we turn to the inquiry at hand.

### 1.    The Defendants' Minimal Contacts with the United States

The minimum contacts inquiry sufficient to support specific jurisdiction focuses on "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977); *accord Walden v. Fiore,* 134 S.Ct. 1115, 1121 (2014). "First, the relationship must arise out of contacts that the "defendant *himself*" creates with the forum State." *Walden*, 134 S.Ct. at 1122 (emphasis in original). Second, "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* Third, "the defendant's conduct . . . must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* at 1123 (quoting *Burger King,* 471 U.S. at 475).

Crediting the facts adduced by the Trustee, the Court concludes that he has established *prima facie* that Laurence and Emilie have sufficient minimum contacts with the United States to support the exercise of specific jurisdiction. Laurence and Emilie – then a minor – entered into contracts with BLMIS, a New York broker dealer, to invest over $66 million, or so they believed, in United States stock markets, activities that could take place only in the United States. According to *Amended Complaint*, Exhibit C, Emilie also invested approximately $11 million in real dollars in November 2005, after she had attained majority and transferred the proceeds of her French treasury securities into her BLMIS account. By doing so, they became subject to the state and federal laws that governed their relationship with BLMIS and availed themselves of the protections granted by the federal securities laws, including SIPA.

13

The evidence also shows that whenever Laurence wanted to make a withdrawal, she contacted BLMIS in New York who, at her request, transferred the funds from its New York bank account. During the life of the account, Laurence withdrew over $147 million, including nearly $17 million on nineteen occasions during the two years preceding the Filing Date. Although the record regarding Emilie's contacts is less clear, she reached majority in 2005, reinvested the proceeds of her French treasury bonds with BLMIS, and thereafter withdrew over $18 million from her own account including more than $8 million through sixteen transfers within the two years preceding the Filing Date. Whether she dealt with BLMIS directly or her mother or another acted on her behalf makes no difference because the conduct of her agents is attributed to her for purposes of the jurisdictional analysis. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 55 (1st Cir.) ("For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal."), *cert. denied*, 537 U.S. 1029 (2002). Furthermore, the withdrawals from the New York investment accounts are the very transfers that the Trustee is seeking to recover as fraudulent transfers. Indeed, "but for Defendants' financial transactions to and from their New York BLMIS bank accounts, there could be no fraudulent transfer claim against Defendants." *Picard v. Cohmad Sec. Corp.* (*In re BLMIS*), 418 B.R. 75, 80 (Bankr. S.D.N.Y. 2009).

The Defendants' motion to dismiss primarily focuses on the French connection. They point out that the *Customer Agreements* were negotiated with Madoff in France, written in French, signed in France and are governed by French law. In this regard, and unlike other BLMIS trading agreements, the *Customer Agreements* did not include a New York choice of law provision. Moreover, Laurence and Emilie never came to the United States in connection with

14

their business with BLMIS.  Finally, they argue that most of the money (and all of Emilie's

withdrawals) were used to pay French taxes.

Although there are obvious French connections to this case, and the Defendants

frequently invoke the French *Customer Agreements*, they fail to explain their relevance to the

Trustee's fraudulent transfer claims.  Furthermore, the reason for the withdrawals – to pay

French taxes on the assumed value of their BLMIS accounts – exacerbates the effect of Madoff's

fraud but does not affect the analysis of jurisdiction or the merits, particularly because the

Trustee concedes their good faith.[16]  That they did not travel to the United States on BLMIS

business does not change the jurisdictional analysis because their conduct with respect to their

BLMIS accounts caused the injury in New York.  *Burger King*, 471 U.S. at 476 ("So long as a

commercial actor's efforts are 'purposefully directed' toward residents of another State, we have

consistently rejected the notion that an absence of physical contacts can defeat personal

jurisdiction there.") (citation omitted).  And although the absence of a New York choice of law

provision is relevant, *see Picard v. Maxam Absolute Return Fund, L.P. (In re BLMIS)*, 460 B.R.

106, 117-18 (Bankr. S.D.N.Y. 2011), *aff'd,* 474 B.R. 76 (S.D.N.Y.  2012); *Cohmad*, 418 B.R. at

80, it is not determinative.  *Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations

Found.*, 297 F.3d 1343, 1354 (Fed. Cir. 2002) ("At most, the inclusion of choice of law and

forum provisions is merely one factor to consider.") *accord Picard v. Chais (In re BLMIS)*, 440

B.R. 274, 279 (Bankr. S.D.N.Y. 2010) (Court had personal jurisdiction over Israeli defendant

who maintained two BLMIS accounts, made transfers to and from those accounts, and appointed

her father as New York agent).  The *Customer Agreements* also do not include a choice of law

---

[16]      Unfortunately, the Defendants are in the same position as many other Madoff victims who paid taxes on
fictitious profits, and then were sued by the Trustee as net winners.

provision, and moreover, the Defendants should reasonably have anticipated being haled into

Court here. *See Burger King*, 471 U.S. at 474 ("[T]he foreseeability that is critical to due

process analysis is that the defendant's conduct and connection with the forum State are such

that he should reasonably anticipate being haled into court there.") (internal quotation marks,

citations and ellipses omitted). Their *Customer Agreements* with a New York-based broker-

dealer contemplated the establishment of New York trading accounts for the purpose of investing

in securities traded on the United States stock markets. It was reasonable for them to anticipate

that any dispute regarding their accounts might be litigated in the United States, especially New

York.

The Defendants also cite *Societe Generale v. Florida Health Scis. Ctr., Inc.*, No. 03 Civ.

5615 (MGC), 2003 WL 22852656, at *4 (S.D.N.Y. Dec. 1, 2003), a suit concerning New York's

long-arm statute, N.Y.C.P.L.R. § 302(a)(1), for the proposition that "maintenance of a bank

account in New York is usually insufficient to confer personal jurisdiction over a non-

domiciliary defendant." (*Defendants Memo*, 15-16.) *Societe Generale*, however, was identified

by the Second Circuit Court of Appeals as among the cases illustrating a split within New York

courts on the issue of whether the maintenance of a correspondent bank account[17] is sufficient to

confer jurisdiction under New York's long arm statute. *Licci*, 673 F.3d at 65 n. 13 (listing cases

holding that mere maintenance of correspondent bank account in New York is not sufficient to

establish personal jurisdiction, including *Societe Generale*). Following certification of the

---

[17]    "Correspondent accounts are accounts in domestic banks held in the name of foreign financial institutions. Typically, foreign banks are unable to maintain branch offices in the United States and therefore maintain an account at a United States bank to effect dollar transactions. Without correspondent banking it would often be impossible for banks to provide comprehensive nationwide and international banking services—among them, the vital capability to transfer money by wire with amazing speed and accuracy across international boundaries." *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (citations and internal quotation marks omitted).

question by the Second Circuit, the New York Court of Appeals disagreed with *Societe Generale* and held that "complaints alleging a foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a course of dealing—show purposeful availment of New York's dependable and transparent banking system, and the predictable jurisdictional and commercial law of New York and the United States." *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 339 (2012) (citation and internal quotation marks omitted).[18]

### 2.    Reasonableness

The Trustee has demonstrated that the Defendants had numerous, ongoing contacts with the United States relating to their BLMIS accounts to support the assertion of specific personal jurisdiction, and the Defendants have failed to present a "compelling case" that other considerations render the assertion of personal jurisdiction unreasonable, unfair or unjust. Though French residents, they chose to invest in the United States, and as noted, should have contemplated that any disputes relating to those investments might find their way into a United States Court.  In addition, as discussed more fully in the next section of this opinion, the relevant evidence is located in the United States, not France.  Finally, Laurence and Emilie have traveled to the United States in the past, but if the burden proves too great, they can appear through videoconferencing and/or testify by deposition.

---

[18]    The facts suggest that the Defendants' New York contacts would also satisfy the standard for long-arm jurisdiction under N.Y. C.P.L.R. § 302(a)(1).  *See, e.g.*, *Credit Lyonnais*, 183 F.3d at 154 (defendants holding an "active account" with plaintiff New York investment banking firm and their alleged breach of agreement to sell certain securities to plaintiff sufficient to confer jurisdiction pursuant to N.Y. C.P.L.R. § 302(a)(1)); *Bluestone Capital Partners, L.P. v. MGR Funds Ltd.*, No. 98 civ. 3128 (WHP), 1999 WL 322658, at *3 (S.D.N.Y. May 20, 1999) ("It is well settled that the quality of a non-domiciliary's contacts with New York are sufficient to confer jurisdiction when it maintains an ongoing investment account in New York and conducts securities transactions through such an account.").

The United States also has a strong interest in applying the fraudulent transfer provisions of the Bankruptcy Code which are incorporated through SIPA. *Maxam*, 460 B.R. at 119; *Cohmad*, 418 B.R. at 81. BLMIS was a broker dealer. SIPA reflects an overriding federal policy "to protect investors against financial losses arising from their broker's insolvency and protect the securities markets as a whole." *Sec. Investor Prot. Corp. v. BLMIS (In re BLMIS)*, 522 B.R. 41, 50 (Bankr. S.D.N.Y. 2014) (citing *In re BLMIS*, 654 F.3d at 235, 239). In this case, the Trustee's ability to recover fictitious profits from net winners through the bankruptcy fraudulent transfer provisions and distribute those recoveries to net losers who funded the Defendants' fictitious profits furthers that goal.

Furthermore, the Trustee has a significant interest in litigating in this Court, and the United States has a substantial interest in resolving the parties' dispute expeditiously. The Trustee has commenced roughly 1,000 other adversary proceedings in this Court. *See Picard v. Maxam*, 460 B.R. at 119 (citation omitted). This Court, the District Court and the Second Circuit Court of Appeals have issued numerous decisions establishing the legal framework for deciding this and similar adversary proceedings. Litigating this adversary proceeding in this Court will result in the "the most efficient resolution" of this dispute, and ultimately, the SIPA liquidation, and promote consistency in the resolution of the many similar disputes pending in this Court.

In conclusion, the Trustee has established a *prima facie* case subjecting the Defendants to the specific personal jurisdiction of this Court. Their minimum contacts are substantial and the exercise of personal jurisdiction is reasonable. Nevertheless, because the Defendants challenge the "quality and nature" of their contacts with BLMIS, *Burger King*, 471 U.S. at 475; *accord Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007), particularly the authenticity and admissibility of the Trustee's Exhibit B and the implications to be drawn therefrom

18

regarding the number and nature of those contacts, the Court will try the issue of personal

jurisdiction together with the trial on the merits.  This is especially appropriate here because the

transfers that form the basis of the Trustee's claims are intertwined with the contacts that support

personal jurisdiction over Laurence and Emilie.  *Walk Haydel & Assocs., Inc. v. Coastal Power

Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008).

### 3.    The Trustee's Other Jurisdictional Theories

The Trustee also bases personal jurisdiction on the Defendants' filing SIPA customer

claims, (*Trustee Memo*, 8-12), and their participation in this adversary proceeding.  (*Id.*, 18.)  As

a rule, filing a claim subjects the creditor to the equitable power of the bankruptcy court because

it triggers the process of allowance and disallowance of claims.  *Granfinanciera, S.A. v.

Nordberg*, 492 U.S. 33, 58-59 (1989); *accord Langenkamp v. C.A. Culp*, 498 U.S. 42, 44 (1990).

Filing a customer claim in a SIPA proceeding is the equivalent of filing a bankruptcy proof of

claim for jurisdictional purposes.  *See Sec. Investor Prot. Corp. v. BLMIS*, 522 B.R. at 59-60.

Consistent the rule's rationale, the submission to personal jurisdiction is limited to

litigation concerning the claims allowance process.  The Second Circuit's decision in *Germain v.

Connecticut Nat'l Bank*, 988 F.2d 1323 (2d Cir. 1993), which involved different facts,

nevertheless illustrates this principle  There, a chapter 7 trustee brought a lender liability action

against a creditor that had filed a proof of claim.  *Id*. at 1325-26.  The trustee asserted that he was

entitled to a jury trial with respect to his lender liability claims.  *Id*. at 1325-26.  The creditor

disagreed arguing that, similar to a creditor who submits to the bankruptcy court's equitable

jurisdiction by filing a proof of claim, the trustee had also submitted to the bankruptcy court's

equitable jurisdiction (and was thus not entitled to a jury trial) when the debtor filed a voluntary

bankruptcy petition.  *Id*. at 1329.

19

The Court of Appeals disagreed with the creditor. It explained that "[f]or a waiver to occur, the dispute must be part of the claims-allowance process or affect the hierarchical reordering of creditors' claims." *Id*. at 1330. The Court distinguished the trustee's lender liability claim from an action bearing directly on the claims allowance process stating that the "[r]esolution of the Trustee's action is not required in order to determine whether to allow [creditor's] claim. . . ." *Id*. at 1327. Instead, the lender liability claims seek "money damages" and have "no effect on the *allowance* of the [creditor's] claims." *Id*. (emphasis in original); c*f. Smith v. Dowden*, 47 F.3d 940, 944 (8th Cir. 1995) ("the successful withdrawal of a creditor's claim prior to the initiation of an adversarial proceeding by the trustee renders the withdrawn claim a legal nullity for purposes of submission to the equitable jurisdiction of the bankruptcy court"); *In re 20/20 Sport, Inc.*, 200 B.R. 972, 979 (Bankr. S.D.N.Y. 1996) (debtor's fraudulent transfer action "did not arise as part of the claims allowance process" where the creditor withdrew proof of claim).

Here, Laurence's and Emilie's customer claims have been finally denied by the Trustee, and the disposition of the adversary proceeding will not affect their disallowed claims. Hence, the adversary proceeding does not implicate the claims allowance process. Instead, the Trustee is seeking legal relief in the form of the recovery of money damages, and Laurence and Emilie did not subject themselves to personal jurisdiction with respect to the Trustee's fraudulent transfer action by filing SIPA claims.

The argument that the Defendants submitted to the personal jurisdiction of the Court through their participation in this adversary proceeding also lacks merit. The Trustee notes that the Defendants entered into numerous stipulations extending their time to answer the complaint

20

and also moved to withdraw the reference.  The Trustee fails to mention, however, that each

stipulation included the following proviso:

> [T]he parties to this stipulation reserve all rights and defenses that they may have,
> and entering into this stipulation shall not impair or otherwise affect such rights
> and defenses, *including without limitation any defenses based on lack of
> jurisdiction.*

(*E.g., Stipulation and Order for Extension of Time to Respond*, dated Mar. 30, 2011, at 2

(emphasis added) (ECF Doc. # 5).)  Hence, the stipulations do not support the Trustee's

jurisdictional argument.

The only other form of participation the Trustee cites is the Defendants' motion to

withdraw the reference.  They filed that motion simultaneously with their motion to dismiss for

lack of personal jurisdiction.  (*See Notice of Defendants The Estate (Succession) of Doris Igoin,

Laurence Apfelbaum, and Emilie Apfelbaum's Motion to Withdraw the Referenc*e, dated Apr. 2,

2012 (ECF Doc. # 16).)  The motion to withdraw the reference focused on four legal issues: the

applicability of the safe harbor under 11 U.S.C. § 546(e), the scope of the good faith defense

under 11 U.S.C. § 548(c), the Court's power to enter a final judgment in light of *Stern v.

Marshall*, and the extraterritorial application of SIPA.  (*Memorandum of Law in Support of

Defendants the Estate (Succession) of Doris Igoin, Laurence Apfelbaum, and Emilie

Apfelbaum's Motion to Withdraw the Reference*, dated Apr. 2, 2012 (ECF Doc. # 18).)  Hundreds

of other defendants moved to withdraw the reference on the same issues, resulting in significant

decisions by the District Court and the Second Circuit.

Aside from the stipulations and the motion to withdraw the reference (and the motion to

dismiss), the Trustee does not point to any other participation by the Defendants in this litigation.

Furthermore, the Trustee has not argued that they participated in the SIPA liquidation case.

Under the circumstances, the filing of two motions on the same day after the Trustee sued the

Defendants for $150 million hardly constituted a "strategic" decision or "a clear attempt to take

advantage of the protections and benefits of United States law." (*Trustee Memo*, 18.)

Lastly, the Trustee's authorities are not apposite. In *Deak & Co., Inc. v. Ir. R.M.P.*

*Soedjono (In re Deak & Co., Inc.)*, 63 B.R. 422 (Bankr. S.D.N.Y. 1986), the defendant filed a

notice of appearance in the bankruptcy case immediately after the debtor filed a chapter 11

petition and prior to the commencement of the adversary proceedings against it, and the Court

considered this "as part of the contact penumbra which [the defendant] established with this

forum." *Id.* at 431. In addition, the filing of the notice of appearance rendered the defendant a

party in interest to the litigation regarding its interest in the property that was the subject of the

adversary proceeding. *Id.* at 431-32. Furthermore, the defendant participated through counsel in

the case and its failure to raise a jurisdictional objection during these proceedings "estopped" it

from challenging the Court's personal jurisdiction. *Id.* at 432-33. In short, the defendant's

"notice of appearance and his regular presence at all key case junctures affecting his interest

coupled with his failure to object to jurisdiction almost a year earlier than he did lead to the

conclusion that [the defendant]" waived a jurisdictional challenge. *Id.* at 433. In the same vein,

the Court in *Picard v. Cohmad*, 418 B.R. at 81 and *Picard v. Maxam*, 460 B.R. at 117 based

personal jurisdiction on the defendants' minimum contacts, which included the filing of notices

of appearance and attendance at court hearings through New York counsel. *Maxam*, 460 B.R.

119; *Cohmad*, 418 B.R. at 81.

Here, the Trustee relies solely on the Defendants' participation in the adversary

proceeding, and that participation is limited to the execution of the stipulations and the motion to

withdraw the reference. The Defendants did not file a notice of appearance or participate in the

case (aside from filing customer claims with the Trustee).  Accordingly, their participation in the

adversary proceeding as alleged by the Trustee did not subject them to personal jurisdiction in

this adversary proceeding.

**B.**      ***Forum Non Conveniens***

In the alternative, the Defendants move to dismiss based on the doctrine of *forum non*

*conveniens*.  "A federal court has discretion to dismiss a case on the ground of *forum non*

*conveniens* 'when an alternative forum has jurisdiction to hear [the] case, and ... trial in the

chosen forum would establish ... oppressiveness and vexation to a defendant ... out of all

proportion to plaintiff's convenience, or ... the chosen forum [is] inappropriate because of

considerations affecting the court's own administrative and legal problems.'" *Sinochem Int'l Co.*

*Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007) (quoting *Am. Dredging Co. v.*

*Miller,* 510 U.S. 443, 447–448 (1994) (in turn quoting *Piper Aircraft Co. v. Reyno,* 454 U.S. 235,

241 (1981), in turn quoting *Koster v. (Am.) Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524

(1947))).  The *forum non conveniens* analysis calls for a three-step approach.  First, the court

must determine the degree of deference to accord to the plaintiff's choice of forum.  Second, it

must consider whether the defendant's proposed forum is adequate to adjudicate the parties'

dispute.  Third, the court must balance the private and public interests implicated in the choice of

forum.   *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005), *cert.*

*denied*, 547 U.S. 1175 (2006); *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73-74 (2d Cir.

2001) (*en banc*).  A court may consider the pleadings, affidavits, and exhibits in deciding the

motion.  *Kitaru Innovations Inc. v. Chandaria*, 698 F. Supp. 2d 386, 389-90 (S.D.N.Y. 2010).

The defendant bears the burden of proof on all of the elements of the motion.  *Bank of Credit &*

*Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001).

The Defendants contend that this adversary proceeding should be litigated in a French court because the New York forum presents burdens to Laurence and Emilie, the relevant documents and witnesses are located in France, French law permits the litigation of the dispute, the Defendants will be denied access to proof because of a French "blocking statute," and French law will govern the result.  (*Defendants Memo*, 19-28.)

### 1.    Plaintiff's Choice of Forum

"A defendant invoking *forum non conveniens* ordinarily bears a heavy burden in opposing the plaintiff's chosen forum."  *Sinochem*, 549 U.S. at 430.  There is "'a strong presumption in favor of the plaintiff's choice of forum,'" *Norex,* 416 F.3d at 154 (quoting *Piper Aircraft Co.,* 454 U.S. at 255), and that choice will not be disturbed "unless the balance is strongly in favor of the defendant."  *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508 (1947).  Moreover, a plaintiff's choice is afforded a high level of deference when he sues in his home forum.  *Iragorri*, 274 F.3d at 71 (citing *Koster*, 330 U.S. at 524).

The plaintiff's forum choice is not, however, entitled to unquestioned acceptance.  "[T]he degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations."  *Iragorri,* 274 F.3d at 71.  On the one hand, "the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens.*" *Id.* at 72 (footnote omitted).  On the other hand, "the more it appears that

24

the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons ... the less deference the plaintiff's choice commands." *Id.*

Here, the Trustee's choice of forum is entitled to substantial deference. He sued in his "home court" where the BLMIS SIPA proceeding is pending, where he was appointed, where he and his counsel work and where he has commenced roughly 1,000 similar adversary proceedings. His selection of this forum did not involve forum shopping; it reflected business as usual.[19]

The Defendants have failed to demonstrate the kind of "oppressiveness and vexation" needed to overcome the presumption in favor of the Trustee's forum choice. Trying this case in New York undoubtedly poses a greater burden on the Defendants than trying it in France. Nevertheless, the burden is not so unreasonable as to be insurmountable or to subject the Trustee to the countervailing burden of trying the dispute in France. Furthermore, although Laurence claims that travel to New York would be a hardship (*Apfelbaum Declaration*, ¶ 26), she has visited the United States as a "tourist," including a trip "in the early 2000s to Philadelphia for a family reunion." (*Id.*, ¶ 14.) In addition, Emilie has attended summer camp in Vermont. (*Id.*) I

---

[19]    The Defendants cite *Carey v. Bayerische Hypo-Und Vereinsbank AG,* 370 F.3d 234 (2d Cir. 2004) to support their argument that a plaintiff's forum choice is afforded less weight where the plaintiff has actively sought international business and the cause of action does not have significant ties to the plaintiff's home forum. (*Reply Memorandum of Law in Further Support of Defendants Motion to Dismiss,* dated Sept. 5, 2012, at 21 (ECF Doc. # 34).) The *Carey* court rejected the plaintiff's choice of forum in favor of a German court because the plaintiff resided in Germany at the time of the events giving rise to the claim (the entry into a contract to purchase an apartment in Germany representing a long-term investment in German real property), the contract provided that German courts would have jurisdiction in the event of any dispute and the parties reasonably expected that any litigation would take place in Germany. *Id.* at 238.

While Madoff travelled to France and signed the *Customer Agreements* there, the Trustee's claims relate to withdrawals from the Defendants' New York trading accounts established to invest in the United States stock markets. Furthermore, the *Customer Agreements* do not contain a forum selection clause, and for the reasons stated, the Defendants should have reasonably expected that any litigation regarding their accounts would occur in New York.

do not mean to suggest that they come to the United States or New York regularly, but only that the burden does not appear to be so great that it has prevented them from traveling here when it served their purposes.

I am also mindful of Laurence's stated desire to be near to and care for her elderly husband. (*Id.*, ¶ 26.) Assuming a trip to New York presents a problem, the impact of any inconvenience of traveling from France to the United States to testify can be mitigated by "the realities of modern transportation and communications." *Rahl v. Bande,* 328 B.R. 387, 407 (S.D.N.Y. 2005). As the Court pointed out during the hearing on the *Motion*, French witnesses could testify via videoconference should they find that traveling to New York is too onerous. (*Tr.* at 47:13-48:17.) This includes Laurence and Emilie. In addition, they could testify by deposition, just as they did in connection with the jurisdictional discovery. Finally, although the Trustee has hired French counsel to address legal issues arising there, and French counsel could presumably represent him if this case is transferred to France, the same may be said of Defendants. They have retained capable counsel in New York who has represented them in these proceedings. Nor does the Trustee's retention of French counsel concede the propriety or convenience of adjudication in France any more than the Defendants' retention of New York counsel constitutes a concession that the case may be more conveniently litigated in New York.

## 2.    Adequate Alternative Forum

"An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Norex*, 416 F.3d at 157 (quoting *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003)). Laurence and Emilie are amenable to the service of process in France and have consented to the jurisdiction of a French court. (*Apfelbaum Declaration*, ¶ 27.) In addition, the Trustee has not

contested the fairness of the French judicial system, or controverted the expert opinion submitted

by the Defendants that French law would permit a trustee to recover a fraudulent transfer.[20]

(*See Reply Declaration of Bruno Quint*, dated Sept. 5, 2012 (ECF Doc. # 36.)

However, "[a] defendant does not does not carry the day simply by showing the existence

of an adequate alternative forum.  The action should be dismissed only if the chosen forum is

shown to be genuinely inconvenient and the selected forum significantly preferable." *Iragorri*,

274 F.3d at 74-75.  As discussed above concerning the burdens on Laurence and Emilie and in

the next section regarding the location of the witnesses and evidence, the Defendants have failed

to show that their burden is so great or that the French forum is so "significantly preferable" as to

warrant the transfer.

### 3.    Private and Public Interest Factors

The third step in the analysis requires the Court to balance the private and public interest

factors set forth in the seminal Supreme Court case *Gulf Oil Corp. v. Gilbert*.  The private

interest factors include: (i) the relative ease of access to sources of proof, (ii) availability of

compulsory process for attendance of unwilling witnesses, (iii) cost of obtaining attendance of

willing witnesses, (iv) issues concerning enforceability of a judgment if one is obtained, and (v)

all other practical problems that make trial of a case easy, expeditious and inexpensive.  *Jacobs*

*v. Terpitz, (In re Dewey & LeBoeuf LLP)*, 522 B.R. 464, 477 (Bankr. S.D.N.Y. 2014) (citing *Gulf*

*Oil Corp.*, 330 U.S. at 508-09).  "In assessing the private interest factors, 'courts should examine

---

[20]    The Trustee contends that his claims would now be time-barred by the applicable French five-year statute of limitations.  (*Trustee Supplemental Reply*, 10.)  "[A]n adequate forum does not exist if a statute of limitations bars the bringing of the case in that forum."  *Bank of Credit & Commerce Int'l (Overseas) Ltd.*, 273 F.3d at 246.  Counsel for the Defendants has responded that they will waive the statute of limitations defense should the claims be brought in France.  (*Tr.* at 32:13-33:11, 51:14-52:3.)

the specifics of the claims: rather than simply characterizing the case as one in negligence, contract, or some other area of law, the court should focus on the precise issues that are likely to be actually tried.'" *Id*. (quoting *Airflow Catalyst Sys., Inc. v. Huss Techs. GMBH*, No. 11 cv 6012 (CJS), 2011 WL 5326535, at *4 (W.D.N.Y. Nov. 3, 2011)).

The Defendants contend that the relevant proof, including the witnesses, is located in France, the contracts are written in French, and the French "blocking statute" makes it a crime for French citizens residing in France to provide documents, information or testimony for use in a foreign proceeding against a French citizen. (*Defendants Memo*, 24.) Their argument misconstrues the nature of the Trustee's claim.

As previously stated, this is a fraudulent transfer action relating to the transfer of assets from BLMIS' New York bank account to the Defendants pursuant to requests made to BLMIS in New York. It is not a contract action. To prove his intentional fraudulent transfer claims, the Trustee must demonstrate that BLMIS made the transfers with fraudulent intent, and the transfers constituted fictitious profits (*i.e.,* the Defendants gave no value for purposes of 11 U.S.C. § 548(c)). The Trustee will presumably rely upon the Ponzi scheme presumption to establish BLMIS' fraudulent intent,[21] and BLMIS' books and records to establish the (1) the extent to which each Defendants' withdrawals consisted of fictitious profits, and (2) the aggregate amount of transfers Laurence and Emilie received within two years of the Filing Date. According to the

---

[21]    Under the "Ponzi scheme presumption" the existence of a Ponzi scheme "demonstrates 'actual intent' as matter of law because 'transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors.'" *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund, Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007) (quoting *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund, Ltd.)*, 359 B.R. 510, 517-18 (Bankr. S.D.N.Y. 2007)). To the extent the Defendants dispute that BLMIS ran a Ponzi scheme, the Trustee may rely on Madoff's allocution in Federal District Court. *Gowan v. Amaranth Advisors L.L.C.* (*In re Dreier LLP*), A.P. No. 10-03493 (SMB), 2014 WL 47774, *11 (Bankr. S.D.N.Y. Jan. 3, 2014).

Trustee, the core evidence needed is electronically stored in a virtual data room containing over

four million documents consisting of "BLMIS customer account records, correspondence,

trading records, and records of internal BLMIS communications and procedures related to

BLMIS's investment advisory business." (*Trustee Memo*, 21 n.14.)  The Defendants have

challenged the Trustee's evidence, and it may be necessary for the Trustee to provide testimony

authenticating the Defendants' BLMIS records and explaining the computation of their fictitious

profits.  Furthermore, the Trustee is not challenging the Defendants' good faith.  (*See Trustee

Memo*, 25-26 n. 20 ("The Trustee's claims in this action extend only to fictitious profits from

Madoff's Ponzi scheme, rather than principal, and therefore no evidence of Defendants' good or

bad faith will be required.").)

　　　The Defendants have failed to explain how their *Customer Agreements* bear on the merits

of or defenses to the Trustee's claims.  They have also failed to show the relevance of the

testimony that their proffered witnesses will give.  The Defendants have identified three French

witnesses.  Dominique Airault (a French Notaire) oversaw Laurence's inheritance, and "can best

describe the French process of inheritance and provide proof that I had no right to my father's

money prior to the time of his death." (*Reply Declaration of Laurence Apfelbaum*, dated Sept. 5,

2012, at ¶ 4 (ECF Doc. # 35).)  Judge C. Standish supervised Emilie's inheritance, approved the

decision to invest with BLMIS, and will "prove that Emilie did not own or have an interest in my

father's money prior to the time of his death." (*Id.*, ¶ 5.)  Finally, Pierre Pradie (a French

attorney and tax advisor) "can offer proof about the monies that we invested in our BLMIS

accounts, the reasons for our withdrawals which were largely to pay French taxes and about our

good faith with respect to our BLMIS accounts." (*Id.*, ¶ 6.)

This testimony is irrelevant.  The Trustee does not contend that Laurence or Emilie had

an interest in Albert's money prior to his death in 1995.  Instead, he maintains that with the

exception of Emilie's rollover of her French treasury bonds in 2005, both accounts were funded

with fictitious profits transferred from Albert's account.  The calculation of the fictitious profits

and the value of the inter-account transfers will be determined under the Second Circuit's net

equity decision, *In re BLMIS,* 654 F.3d 229, and this Court's inter-account transfer decision.  *In

re BLMIS*, 522 B.R. 41.  Moreover, as stated, the Trustee does not question the Defendants' good

faith.  Lastly, the withdrawal of the money to pay taxes the Defendants never should have had to

pay is not a defense to the fraudulent transfer claims.  *Donell v. Kowell*, 533 F.3d 762, 778-79

(9th Cir.), *cert. denied*, 555 U.S. 1047 (2008).  Instead, the pertinent witnesses and evidence

regarding their BLMIS accounts and the transfers at issue are here.

Finally, the Defendants contend that the French "blocking statute" will prevent them

from defending this lawsuit, and subject them to possible criminal prosecution in France.  Article

1A of the French "blocking statute," Law No. 80–538 of July 16, 1980 (English translation)

provides:

> Subject to treaties or international agreements and applicable laws and
> regulations, it is prohibited for any party to request, seek or disclose, in writing,
> orally or otherwise, economic, commercial, industrial, financial or technical
> documents or information leading to the constitution of evidence with a view to
> foreign judicial or administrative proceedings or in connection therewith.

*Société Nationale Industrielle Aérospatiale v. United States Dist. Court for the S. Dist. of Iowa*,

482 U.S. 522, 526 n. 6 (1987).  "It is well settled that such statutes do not deprive an American

court of the power to order a party subject to its jurisdiction to produce evidence even though the

act of production may violate that statute," and "American courts are not required to adhere

blindly to the directions of such a statute."  *Id.* at 544 n. 29.  In the final analysis, Laurence and

Emilie voluntarily chose to invest with BLMIS in the United States and are now subject to litigation resulting from those investments. The French "blocking statute" does not immunize them from the prosecution of the Trustee's United States-based claims in this Court.

The Defendants also argue that litigating Trustee's claim in New York is impractical because he would likely have to file a subsequent enforcement proceeding in France to collect on the New York judgment. Although filing enforcement actions in foreign jurisdictions may prove necessary should the Trustee prevail in some or many of the BLMIS avoidance actions, the Trustee argues that doing so is far more efficient and beneficial to the estate than reformulating his claims under applicable foreign laws and refiling suits in those countries. In the end, the Trustee has concluded that the benefit of litigating in New York outweighs concerns regarding the enforceability of a judgment against the Defendants. Furthermore, while Mr. Quint has opined on the underlying illegality of the *Customer Agreements* under French law, the Defendants have not offered any expert proof that a French court would refuse to enforce a final judgment issued against any of the Defendants in this adversary proceeding.

Having concluded that the private interest factors weigh against transferring the adversary proceeding to France, the Court must also balance the public interest factors, which include (i) the administrative difficulties flowing from court congestion, (ii) the local interest in having controversies decided at home, (iii) the interest in having a trial in a forum that is familiar with the law governing the action, (iv) the avoidance of unnecessary problems in conflicts of laws or in the application of foreign law, and (v) the unfairness of burdening citizens in an unrelated forum with jury duty. *Dewey & LeBoeuf LLP*, 522 B.R. at 479 (citing *Gulf Oil Corp.*, 330 U.S. at 508-09). The Defendants do not argue that there are any administrative difficulties

flowing from court congestion or that a trial in this Court (or the District Court) will impose an undue burden on a local jury should a jury trial be demanded and prove necessary.

In addition, there is a substantial interest in trying the adversary proceeding in this Court which is already administering the underlying BLMIS SIPA liquidation in addition to roughly 1,000 other avoidance actions. These litigations share common factual and legal issues, and numerous decisions by this Court, the District Court, and the Second Circuit Court of Appeals will govern the litigation of all adversary proceedings related to the BLMIS liquidation. This Court is familiar with this law, and keeping the cases in this District best serves the interest of judicial economy. Conversely, transferring the litigation to a French court to try a single adversary proceeding makes little sense under these circumstances.

Instead, the Defendants contend that this litigation concerns a French contract governed by French law and involves French defendants and French witnesses. These public interest arguments echo their jurisdictional and private interest contentions. As already stated, this suit involves claims to recover fraudulent transfers made from BLMIS' New York bank account. The claims arise under the Bankruptcy Code, and the merits of the fraudulent transfer claims do not implicate the provisions of the *Customer Agreements* or French law. Moreover, the SIPA liquidation and the Trustee's lawsuits are designed to further the public policy of the United States to protect customers of insolvent broker-dealers.

Accordingly, the Defendants have failed to sustain their burden of proof, and the motion to dismiss based on *forum non conveniens* is denied.

The Court has considered the remaining arguments made by the Defendants and concludes that they lack merit.  Settle order on notice.

Dated:        New York, New York
              February 13, 2015

                              /s/ *Stuart M. Bernstein*
                              STUART M. BERNSTEIN
                         United States Bankruptcy Judge